# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Robert E. Blackburn

Criminal Case No.  06-cr-00424-REB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  ZACHARY LANGEL,

     Defendant.

---

## ORDER GRANTING IN PART AND DENYING IN PART THE MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

---

**Blackburn, J.**

     The matter before me is defendant's **Motion To Suppress Statements And Evidence** [#29] filed December 28, 2006. I grant the motion in part and deny it part.

     In fashioning my ruling I have considered all relevant adjudicative facts in the file and record of this case.  I have considered the evidence educed at the March 1, 2007, evidentiary hearing.  I have considered the reasons stated, arguments advanced, and authorities cited by counsel in their papers and during oral argument following the evidentiary hearing.  I have considered the totality of relevant circumstances.  In assessing the credibility of the one law enforcement witness who testified during the suppression hearing, I have considered all facts and circumstances shown by the evidence that affected the credibility the witness, including the following factors: the witness' means of knowledge, his ability to observe, and his strength of memory; the manner in which the witness might be affected by the outcome of the hearing; the relationship the witness has to either side in the case; and the extent to which, if at all,

the witness is either supported or contradicted by other evidence presented during the hearing. My findings of fact are based upon a preponderance of the evidence.

## I. FINDINGS OF FACT

The evidence in opposition to and support of the motion to suppress was presented by and through Officer David Gallegos, who I found to be credible and cogent.

On September 27, 2006, at approximately 8:24 p.m., Officer David Gallegos and his partner, Officer Michael Gaskill, and Detective Craig Apple of the Aurora, Colorado, Police Department were on patrol in their unmarked, silver Dodge Intrepid on east Colfax in Aurora, Colorado. Their police vehicle was equipped with emergency lights and siren, a police radio, and an on-board computer. The officers were assigned to the gang intervention unit and were wearing gang unit uniforms, which clearly identified them as police officers. The officers were wearing their duty rigs, which included, *inter alia*, handcuffs, a police radio, a flashlight, a holster and handgun.

The officers were proceeding west bound on east Colfax, which is a major four-lane street with two westbound lanes and two eastbound lanes separated by a center median.  Traffic was moderately heavy.  As they approached the 11500 block of east Colfax in the vicinity of the intersection of Colfax and Missouri, they observed the vehicle in front of them in the right westbound lane weave and drift out of the right westbound lane, move approximately one foot across the dotted center line that separates the right westbound lane from the left westbound lane where the vehicle remained for about a second, and then move to the left where it straddled the center line where it remained for another second before it swerved abruptly back into the right

westbound lane in which it had been traveling.

At the time of these observations, the officers had been behind the vehicle for about three blocks, or approximately thirty seconds.  At that same time there was another vehicle traveling westbound in the left westbound lane between the officers' vehicle and the vehicle they were following. These erratic acts of driving were not preceded by turn signals or hand signals and were not dictated by other traffic or road or weather conditions.  The acts of weaving and swerving occurred in an area that has a high incidence of alcohol and drug related driving offenses, vehicle accidents, and pedestrian-vehicle accidents.

Based on their personal observations of the vehicle, the officers initiated a traffic stop. In response the defendant pulled over promptly and parked correctly. Officer Gallegos approached the defendant's vehicle on the driver's side, and Officer Gaskill approached on the passenger's side.[1]  As he approached, Officer Gallegos observed the defendant roll down the passenger window. Officer Gallegos observed smoke inside the defendant's vehicle, and contemporaneously he smelled a really heavy odor of freshly burnt marijuana emanating from inside the vehicle.  At this point the traffic stop became a criminal investigation. Officer Gallegos reasonably believed that the defendant could have been driving under the influence of marijuana or that the defendant had used and/or possessed marijuana illegally.

Office Gallegos had the defendant step out of his car and step to the nearby sidewalk. Officer Gallegos requested, received, and reviewed the defendant's driver's

---

[1] It is unknown what, if anything, Detective Apple did during the entire incident.

-3-

license, which appeared to be in order. Officer Gallegos patted the defendant down for weapons, but none was found on his person. As he interacted with the defendant at close range, Officer Gallegos smelled the distinct odor of marijuana on the defendant's person.

As Officer Gallegos was interacting with the defendant, Officer Gaskill, as the covering officer, asked the defendant how much marijuana he had smoked. Defendant answered, "one roach."  Defendant said that he had swerved as he was throwing the roach out the window. Officer Gallegos placed the defendant in handcuffs.

While Officer Gallegos was still interacting with the defendant, Officer Gaskill began a search of the passenger compartment of the car. The officers had probable cause to search the car based on observing the defendant's erratic driving and seeing and smelling marijuana smoke in his car. Officer Gaskill's search began approximately two to five minutes after the defendant had been stopped. Officer Gaskill first signaled to Officer Gallegos and then told him that he had found a handgun in the car under the driver's seat.

Defendant asked Officer Gallegos what was happening. Officer Gallegos informed the defendant that they had found a gun in the car.  Officer Gallegos advised the defendant that he was under arrest. Spontaneously, the defendant volunteered that "he was done, and he was going away for a very long time." Officer Gallegos responded by asking the defendant if he had been convicted of a felony. Defendant said that he had already been convicted of a federal crime in Kansas for having a weapon.

At 8:39 p.m., which was approximately six minutes after the defendant had been stopped, the officers ran a computer check to determine if the defendant was subject to

any outstanding arrest warrants. Their check revealed that the defendant was subject to an arrest warrant issued by the City and County of Denver for contempt of court (Government Exhibit 1). Pursuant to police department policy, the person subject to such an arrest warrant is placed under arrest and taken into custody. Contemporaneously, the viability of the arrest warrant is confirmed through the police department's records' division, and once confirmed, the arrestee is taken to jail.

Officer Gaskill requested a digital camera to photograph the handgun. The officers waited on scene until a digital camera was delivered by the duty sergeant. The handgun was photographed (Government Exhibits 3,4, and 5).

Defendant asked permission to call his mother. Eventually, the defendant was permitted to call his mother, whom he told in the presence and hearing of the officers that he had been caught weaving and smoking marijuana. Defendant did not mention the handgun to his mother during this call.

Defendant was then transported to the Aurora Police Department Detention Center. Approximately twenty to twenty-five minutes had elapsed between the time of the initial stop and the transport.

At the Aurora Police Department Detention Center, the defendant was taken to the "soft" booking area to a room that was approximately 35 to 40 feet long and 10 feet wide. In this room were filing cabinets, three desks with computers on them, and four extra officer chairs. The defendant and Officers Gallegos and Gaskill entered the room together.

Defendant was not handcuffed, and the two officers were not armed. Defendant was seated in a chair at the side of one of the desks in the room.

At approximately 9:42 p.m., Officer Gallegos verbally *Mirandized*[2] the defendant, reading from an Aurora Police Department Advisement of Rights Form (Government Exhibit 7). Defendant placed his initials as indicated on the advisement form. Defendant answered "yes" to the two questions on the advisement form. Defendant indicated that he understood his legal rights. Defendant indicated that he wanted to talk to the officers. Defendant then knowingly and voluntarily executed the advisement of rights form, which was witnessed by Officer Gallegos.

During the interview everyone spoke in conversational tones. Voices were never raised. The officers learned from the defendant that he had completed his GED in prison. Defendant denied consuming any alcohol. Defendant told the officers that the roach he had been smoking was less than an inch in length and that he was not under the influence of marijuana.

Officer Gallegos did not observe any indicia of intoxication. Defendant appeared to understand Officer Gallegos as they conversed. Defendant discussed the handgun in a relevant and coherent way. Defendant made a series of inculpatory statements during the interview, which lasted about thirty minutes.

Officer Gallegos called ATF Special Agent Brad Beyersdorf, who came to the detention center to interview the defendant. Agent Beyersdorf was not armed. He verbally *Mirandized* the defendant using a DOJ, ATF "Advice of Rights and Waiver" form (Government's Exhibit 8). Agent Beyersdorf read the form to the defendant – both the statement of rights and the waiver. Agent Beyersdorf asked the defendant if he

---

[2] A familiar shorthand reference to the advisement of rights required by the Supreme Court in the seminal case of ***Miranda v. Arizona***, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

understood. Defendant said that he did. Agent Beyersdorf handed the advisement form

to the defendant who appeared to review it. Defendant then executed the form

knowingly and voluntarily without asking any questions or expressing any concerns.

Agent Beyersdorf then proceeded to interview the defendant. As with the first interview,

the tone of this interview was conversational. The when, where, and how of this

interview was otherwise unremarkable.

## II. CONCLUSIONS OF LAW

### A. The Stop

The defendant claims that the officers lacked probable cause to stop him. I

disagree. Based on their personal observations of the defendant's erratic driving, they

had both reasonable suspicion[3] and probable cause[4] to stop him for violating §42-4-

903(1), C.R.S.,[5] and 42-4-1007(1)(a), C.R.S.[6]  The officers' personal observations of

defendant's erratic driving when, where, and how it occurred constituted probable

cause.[7]  Thus, the traffic stop, which was based on observed traffic violations, was

---

[3] *See* **United States v. Rice**, 2007 WL 1180421, *2 (10th Cir.(Okla.)) ("A determination of reasonable suspicion is based on an objective standard taking the totality of the circumstances and information available to the officers into account.") (internal quotations and citations omitted).

[4] *See* **Marshall v. Columbia Lea Regional Hosp.** 345 F.3d 1157, 1166 (10th Cir. 2003).

[5] Section 42-4-903(1), C.R.S., provides in relevant part: "No person shall . . . turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after giving an appropriate signal in the manner provided in sections 42-4-608 and 42-4-609."

[6] Section 42-4-1007(1)(a), C.R.S., provides in relevant part: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

[7] The two cases on which the defendant relies principally are distinguishable both factually and legally. In **United States v. Gregory**, 79 F.3d 973 (10th Cir. 1996), the court of appeals reversed the district court's denial of defendant Gregory's motion to suppress, holding that under Utah law a single act of weaving to the right of the roadway into the emergency lane under circumstances where the road was

justified at its inception[8] and valid under the Fourth Amendment.[9]

Based on Officer Gallegos both witnessing defendant's erratic driving and then seeing and smelling marijuana smoke in the defendant's car, the officers had probable cause also to arrest the defendant for driving under the influence of drugs, *see* §42-4-1301(1)(a), C.R.S.,[10] and/or for possessing and using marijuana, *see* § 18-18-406, C.R.S., both arrestable offenses. *See* §16-3-102(1)(b), C.R.S. ("A peace officer may arrest a person when: . . . [a]ny crime has been or is being committed by such person in his presence . . . .")

### B. The Search

Thus, the contemporaneous search of defendant's vehicle was incident to a lawful arrest, which is one of the recognized exceptions to the warrant requirement of the Fourth Amendment. *See **New York v. Belton***, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); ***United States v. Lugo***, 170 F.3d 996, 1003 (10th Cir. 1999). It matters not that the search may have preceded the formal arrest by a matter of seconds. *See **United States v. Torres-Castro***, 470 F. 3d 992 (10th Cir. 2006). It matters not whether the defendant is arrested eventually for a crime other than that for

---

winding, the terrain was mountainous, and the weather condition was windy did not warrant the stop of defendant Gregory. Similarly, and in reliance on ***Gregory***, in ***United States v. Gastellum***, 927 F.Supp. 1386 (D.Colo. 1996), the district court, in *dicta,* opined that a similar act of momentary weaving to the right shoulder did not warrant a traffic stop. In the case at bar, defendant Langel  weaved inexplicably and without an advance turn or hand signal to the left into an active lane of traffic with another vehicle nearby under circumstances that did not involve adverse weather or driving conditions and that implicated Colorado statutes other than just "weaving."

[8] *See **Rice*** at *3.

[9] *See **United States v. Botero-Ospina***, 71 F.3d 783, 787 (10th Cir. 1995).

[10] Driving under the influence of drugs includes the lessor included offense of driving while impaired by drugs, *see* §42-4-1301(1)(b), C.R.S.

which probable cause existed initially. All that matters is – as here – probable cause to arrest existed at the time the search was initiated.[11]

Additionally and alternatively, "If an officer smells marijuana in the passenger compartment of a vehicle, he has probable cause to search the passenger compartment." **United States v. Parker**, 72 F.3d 1444, 1450 (10th Cir. 1995) (citations omitted). Therefore, whether analyzed as a vehicle search incident to arrest or as a search precipitated by the odor of marijuana, the search of the passenger compartment did not offend the Fourth Amendment.

### C. The Statements

#### 1. At The Scene

At the scene of the traffic stop and eventual arrest, the defendant made several statements.  First, as Officer Gallegos was interacting with the defendant outside his vehicle, Officer Gaskill asked the defendant how much marijuana he had smoked. Defendant answered, "one roach."  Second, the defendant said that he had swerved as he was throwing the roach out the window of the car.  Third, when Officer Gallegos advised the defendant that he was under arrest, the defendant volunteered spontaneously that "he was done, and he was going away for a very long time." Fourth, when Officer Gallegos responded by asking the defendant if he had been convicted of a

---

[11] Furthermore and alternatively, under the inevitable discovery doctrine, the warrantless search of the vehicle and seizure of the handgun  would have been justified. Within six minutes of stopping the defendant, the officers learned that the defendant was subject to an arrest warrant issued by the City & County of Denver. This discovery would have led undoubtedly to the defendant's arrest. In turn, the vehicle could have been searched incident to the defendant's lawful arrest or would have been subject to an inventory search required as a part of it being impounded. Under either scenario the handgun would have been discovered and seized inevitably.  See **United States v. Haro-Salcedo**, 107 F.3d 769, 773 (10th Cir. 1007) ("[I]f evidence seized unlawfully would have been discovered pursuant to a legal search, the evidence is admissible.")

felony, the defendant said that he had already been convicted of a federal crime in Kansas for having a weapon. Fifth and finally, when the defendant was permitted to call his mother, he told her that he had been caught weaving and smoking marijuana.

The defendant's first, second, and fourth statements above must be suppressed. Defendant was subjected to custodial interrogation without the benefit of antecedent *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Contrastingly, the defendant's third and fifth statements above should not be suppressed. Defendant's third statement above – that "he was done, and he was going away for a very long time," was volunteered spontaneously. "Volunteered statements of any kind are not barred by the Fifth Amendment . . ." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (Internal quotations and citations omitted). Absent interrogation, *Miranda* warnings are not required. Defendant's fifth statement above to his mother was volunteered and not the product of custodial interrogation and should not be suppressed. *Id*.

### 2. At The Station

Because I have concluded that the Fourth Amendment was not impinged when the defendant was stopped and when his vehicle was searched, the defendant's statements first to Officer Gallegos and Officer Gaskill and then to ATF Special Agent Brad Beyersdorf may not be suppressed on Fourth Amendment grounds. *See New York v. Harris*, 495 U.S. 14, 19, 110 S.Ct. 1640, 1644, 109 L.Ed.2d 13 (1990).

Thus, the issue becomes whether the defendant's statements, which he made in

the first interview with Officers Gallegos and Gaskill and/or in the second interview with ATF Special Agent Beyersdorf must be suppressed under the Fifth Amendment. I have considered the totality of relevant circumstances. Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation. I have considered such factors as 1) the age, intelligence, and education of the defendant; 2) the length of detention; 3) the length and nature of the questioning; 4) whether the defendant was advised of his constitutional rights; and 5) whether the defendant was subject to physical punishment. *United States v. Toles*, 297 F.3d 959, 965-66 (10th Cir. 2002) (citations omitted); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)*.* Based on the facts, which I have found from the evidence, I conclude ultimately as follows; 1) that before agreeing to speak first to Officers Gallegos and Gaskill, and then to ATF Special Agent Beyersdorf, the defendant was advised of his *Miranda* rights in a proper and timely manner; 2) that the defendant understood his *Miranda* rights; 3) that he voluntarily, knowingly, intelligently, and intentionally waived his *Miranda* rights and consented to be interviewed; 4) that he did not revoke or modify his waiver of rights of September 27, 2006; and 5) that his statements of September 27, 2006, were made voluntarily, knowingly, intelligently, and intentionally, while the defendant was alert, competent, and sober, and were not the result of mistake, misunderstanding, mental illness, fear, force, threats (express or implied), coercion, undue influence, fatigue (mental or physical), privation, promises (express or implied), emotional vicissitudes, evidence ploys, or insidious police interrogation tactics.

-11-

There was nothing unreasonably coercive or minatory about the where, when, or how of the two September 27, 2006, interviews. In summary, the government's conduct did not cause defendant's will to be overborne and his capacity for self-determination to be critically impaired. **U.S. v. McCullah**, 76 F.3d 1087, 1101 (10th Cir. 1996); **United States v. Lopez**, 437 F.3d 1059, 1063 (10th Cir. 2006).

### III. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

**1.** That defendant's **Motion To Suppress Statements And Evidence** [#29] filed December 28, 2006, **IS GRANTED IN PART AND DENIED IN PART:**

a. That the motion is granted concerning the defendant's first, second, and fourth statements at the scene, concerning the amount of marijuana smoked, the disposition of the marijuana "roach", and the defendant's prior felony conviction, which statements are suppressed; and

b. That the motion is denied otherwise.

Dated April 25, 2007, at Denver, Colorado.

**BY THE COURT:**

**s/ Robert E. Blackburn**
**Robert E. Blackburn**
**United States District Judge**